UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
UNITED STATES OF AMERICA                )
                                        )
         v.                             )     CRIMINAL NO. 05-10067-PBS
                                        )
TALMUS R. TAYLOR,                       )
                                        )
         Defendant                      )
_____)

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America submits this memorandum in anticipation of the sentencing hearing in this case. In this memorandum, the government presents (1) a summary of the key facts; (2) the government's guidelines calculations[1] and sentencing recommendation; and (3) a response to the departure and sentencing arguments set forth in the Defendant's Sentencing Memorandum.

**I.   Facts**

On March 29, 2006, following a seven-day trial, a jury convicted Talmus Taylor of sixteen counts of aiding and assisting in the preparation of false tax returns, in violation of 26 U.S.C. § 7206(2). The offense conduct is summarized in the PSR at ¶¶ 8-16. Rather than review the evidence in detail here, the government concentrates on four factual points that it believes are material to the Court's determination: (A) Taylor not only aided in the presentation of false tax returns – he <u>manufactured</u> the false information; (B) Taylor sought to obstruct justice to avoid apprehension and, later, prosecution; (C) Talyor has displayed no remorse or acceptance of

---

[1] With the exception of the applicability of an enhancement for obstruction of justice (U.S.S.G. §3C1.1), there are no disputes concerning the guidelines calculations.

responsibility; and (D) Taylor's conduct harmed his clients, as well as the public interest.

      **A.**      **Taylor Manufactured the False Information at Issue**

The evidence at trial made abundantly clear that Taylor not only aided in the presentation of false tax returns, he manufactured the false information. The clearest evidence of this was Taylor's preparation of identical handwritten Goodwill donation lists for different clients in the same year – *i.e.* for unrelated taxpayers, the defendant prepared documents claiming the taxpayers had donated precisely the same quantities of dozens of different items, including identical numbers of shoes, drapes, throw rugs, and the like. Cross-examination of the defendant revealed that the defendant started the process with the false donation lists and then falsified other portions of the tax returns to make them consistent with the false donation lists. Thus, this is not a case of a tax preparer simply turning a blind eye to the falsity of information being provided by his clients. In this case, it is the defendant tax preparer who is the source of the falsity.

      **B.**      **Taylor Sought to Obstruct Justice to Avoid Apprehension and Conviction**

Taylor sought to obstruct justice in three ways. First, as Gregory Alves and Sheryl Fernandes testified at trial, the defendant counseled them to falsify evidence and to lie to the IRS when the IRS questioned them concerning their tax returns. Specifically, the defendant told these two witnesses (his clients) to tell the IRS that the claims of non-cash donations were accurate. The defendant knew that such statements would be false. The defendant further advised these same two clients to obtain receipts from Goodwill to document falsely donations claimed on the clients' tax returns. In the case of Gregory Alves, the client refused to go along with Taylor's suggestions. Sheryl Fernandes, on the other hand, complied with those

suggestions. Fernandes testified that the defendant helped her fill out the false receipts and that the defendant signed them (falsely) as the representative of Goodwill.

Second, Taylor made false statements to both the IRS and an Assistant U.S. Attorney during two pre-indictment interviews. The defendant claimed that he made claims for deductions based solely on information provided to him by his clients. More specifically, he claimed that his clients told him the quantities of items that they had donated to Goodwill, that he simply served as a scrivener in writing those quantities down, and that he then calculated the dollar values by using the Salvation Army valuation guide attached to the returns. The defendant further stated that he sat down with each client and reviewed the completed return line by line before they signed it. When confronted with examples of different clients for whom he submitted identical handwritten donation lists, the defendant claimed that this must have resulted from a clerical error on his part – perhaps from inadvertently mixing up paperwork at his photocopy machine. Each of the clients who testified at trial contradicted the defendant in every material respect.

Third, the defendant committed perjury at trial. In his testimony, he reiterated what he had said in pre-indictment interviews. With regard to each tax return specified in the indictment, the defendant claimed to have very specific recall of what each client had told him about non-cash donations to Goodwill. He further claimed that he simply recorded what his clients told him. Each of the clients who testified at trial (the nine clients listed in the indictment and several others) contradicted the defendant. Each said that the claims of non-cash donations were either totally false or grossly inflated. This Court should find – as did the jury – that the defendant's

testimony was materially false.[2]

### C.     Taylor Has Displayed No Remorse or Acceptance of Responsibility

Through it all, Taylor has given no indication that he feels remorse or accepts responsibility for his conduct.  Instead, he has denied his conduct and lied about it under oath. Especially in light of his argument that he should be spared jail so he can continue his work as a teacher and role model (Defendant's Memorandum at 2-5), the Court should consider what kind of message it would send to Taylor's students and society in general to impose no jail time on a defendant who participated in a brazen multi-year scheme to defraud and then had the audacity to lie about it under oath.

### D.     Taylor's Conduct Harmed His Clients As Well As the Government

Though this Court may, with good basis, find that certain of Taylor's clients may have been aware of, and complicit in, the presentation of false tax returns, certain others were not and have been victimized by the defendant's conduct.  These witnesses relied on Taylor's expertise and trusted him to prepare their returns correctly and legally.  Instead, they were dragged into a process of IRS audits and subjected to interest and penalty assessments.  The clearest example of a client Taylor victimized is the government's first witness, Brenda Fergus.  Ms. Fergus, a fellow school teacher, had always prepared her own returns previously.  She sought Taylor's services when her husband was diagnosed with cancer.  At this time of vulnerability, she put her trust in

---

[2] Though relevant only to the defendant's credibility, it is noteworthy that the defendant's testimony concerning his own donation habits was patently incredible.  He testified that he accurately claimed thousands of articles of clothing – from children's clothing to tuxedos – as donations to Goodwill during the same period that he was making similarly outlandish claims on behalf of his clients.  He also permitted one of his clients, Barbara East, to testify that she too made Goodwill donations that, in their volume and content, were equally unbelievable.

the defendant, only to have it betrayed.

## II.     Guidelines Calculations and Government's Sentencing Recommendation

### A.     Guidelines

There is no dispute that, under the Sentencing Guidelines, the base offense level is fifteen, pursuant to U.S.S.G. § 2T1.4(a), based on a tax loss of approximately $130,000, and is increased by two levels because the defendant was in the business of preparing tax returns. U.S.S.G. § 2T1.4 (b)(1)(B). See PSR ¶¶ 23-24. The PSR describes the basis for an additional two-level adjustment for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. The government submits that such an adjustment is required under the Guidelines.

Deliberately false testimony by a defendant constitutes obstruction, while inadvertent falsity does not. United States v. Dunnigan, 507 U.S. 87, 94 (1993). Inadvertence is not an issue in this case: as explained above, Taylor knew that the information on the tax returns was false because he manufactured it. Moreover, Taylor's description of his dealings with his clients was remarkable for its detail and specificity. Not only did he falsely describe his dealings with his clients, he did so in astonishing, manufactured detail. For example, Taylor testified that he counseled several clients to be more modest in their claims of Goodwill donations, telling the clients better "safe than sorry." The falsity of the information and the defendant's knowledge of the falsity were the sole issues at trial. Thus, the defendant's false testimony went to centrally material issues. The obstruction-of-justice enhancement applies.

With the obstruction-of-justice enhancement, the total offense level is 19. Because the defendant is in criminal history category I, the GSR is 30-37 months. See PSR at ¶ 73. The term of supervised release is one year. Id. at ¶ 78. The fine range is $6,000 to $60,000. Id. at ¶ 82.

A special assessment of $1,600 is mandatory.  Id. at ¶ 83.

    **B.**    **Government's Sentencing Recommendation**

The government recommends a sentence of 30 months imprisonment (low end of GSR); one year of supervised release, a fine of $6,000, and a special assessment of $1,600.  Without repeating the discussion above, Taylor engaged in a multi-year scheme to defraud; his conduct caused harm to others and to the integrity of the tax system; and he obstructed justice in an attempt to avoid apprehension and conviction.  To reflect the seriousness of the crime, promote respect for law, provide just punishment and afford adequate general deterrence, a sentence of incarceration is called for.  See 18 U.S.C. § 3553(a).

**III.**    **A Downward Departure Is Not Warranted**

Taylor argues that this Court should depart downward based on his work as a teacher because, Taylor argues, the effect of his incarceration on his students takes the case out of the "heartland."  There is simply no basis for such an assertion in this case.[3]  As the First Circuit has recognized in numerous contexts, incarceration typically has an effect on innocent third parties and jail is not limited to those whose absence will not be missed.  See, e.g. United States v. Louis, 300 F.3d 78, 82 (1st Cir. 2002 ("A defendant's incarceration will invariably cause hardship to his family.  We cannot presume, as a general matter, that the Commission either overlooked or inadequately considered such a consequence in formulating the guidelines)(citation and internal quotation marks omitted); United States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002).  "Regrettably, the 'heartland' of cases under the Guidelines encompasses immense and

---

[3] Nor can Taylor argue that the prospect of losing his job takes this case out of the heartland.  See Koon v. United States, 518 U.S. 81, 110 (1996) (loss of civic employment after conviction does not take case out of heartland.

heart-wrenching hardships.")(citation omitted). By way of further example, the First Circuit, explaining that there is nothing atypical about a defendant's incarceration causing family hardship, has listed the types hardships – both financial and emotional – that have been deemed insufficient to take defendants out of the heartland. See United States v. Pereira, 272 F.3d 76, 80-83 (1st Cir. 2001) (citing cases holding, e.g., imprisonment of both mother and father of a four-year old not extraordinary; same with regard to defendant with neurologically impaired nine-year old son and wife with fragile mental health; same with regard to single mother and sole provider or five children, one of whom had substantial neurological impairment; same with regard to single mother whose imprisonment would require placing children in foster care.)

Taylor analogizes his circumstances to those in United States v. Olbres, 99 F.3d 28 (1st Cir. 1996), which held that a sentencing court may consider whether a case is "so unusual as to warrant a downward departure based on the loss of jobs to innocent employees occasioned by the imprisonment of the defendant owner of a small business." Id. at 29. However, while acknowledging the possibility of such a departure, the First Circuit observed that:

> It is a rare case which does fall outside. As courts have recognized, incarceration of a defendant inevitably means that the defendant will no longer be employed in his previous position and that fact inevitably will have consequences. See, e.g., Milikowsky, 65 F.3d at 8 ("[T]he Commission could hardly have overlooked the effect that imprisonment of offenders would have on small businesses that are likely to be heavily dependant on those very offenders for their continuing success."). The mere fact that innocent others will themselves be disadvantaged by the defendants' imprisonment is not alone enough to take a case out of the heartland. These issues are matters of degree, involving qualitative and quantitative judgments.

Id. at 29. In short, Taylor's employment as a school teacher - an important job no one disputes he does well – does not entitle him to an automatic get out of jail free card. Put differently, there is no support for the suggestion that school teachers constitute a category of individuals outside

7

the heartland of white collar defendants. Rather, to be eligible for a departure, a defendant must show specific facts that take his case outside the heartland.

Taylor has failed to do so here. White collar defendants are typically employed and their incarceration will typically affect people with whom they work – be they employees, customers, patients, clients, or students.

## Conclusion

For the foregoing reasons, the United States requests that the Court impose a sentence of 30 months imprisonment, one year of supervised release, a fine of $6,000, and a special assessment of $1,600.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/ John A. Capin

JOHN A. CAPIN
Assistant U.S. Attorney