# United States Court of Appeals
## For the First Circuit

No. 06-2216

UNITED STATES OF AMERICA,

Appellant,

v.

TALMUS R. TAYLOR,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Patti B. Saris, U.S. District Judge]

Before

Torruella, Circuit Judge,
Newman* and Lynch, Circuit Judges.

John A. Capin, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellant.
Bruce T. Macdonald, for appellee.
Elizabeth L. Prevett and Miriam Conrad, Federal Public
Defender, Federal Defenders Office, were on brief as amicus curiae
in support of appellee.

August 17, 2007

_____

* Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Talmus R. Taylor was tried and convicted of sixteen counts of aiding and assisting in the preparation of false tax returns, a violation of 26 U.S.C. § 7206(2). The district court sentenced Taylor to one year in a halfway house, five years of probation, and a $10,000 fine. The Government now appeals Taylor's sentence, claiming that it is substantively unreasonable. After careful consideration, we conclude that a non-jail sentence was unreasonable in light of the district court's explanation and the factors the court was obligated to consider under 18 U.S.C. § 3553(a).

## I. Background

In 1997, Taylor, a teacher at Fifield Elementary School in Dorchester, Massachusetts, took a second job as a part-time income tax preparer. In this capacity, Taylor submitted federal tax returns on behalf of his clients. Many of the returns submitted by Taylor claimed deductions for charitable contributions of $9,000 to $19,000 worth of goods per year to Goodwill, donations which his clients had not in fact made. The false claims were accompanied by handwritten lists that purported to be records of specific contributions along with their alleged value.

When the Internal Revenue Service ("IRS") noticed a suspicious pattern in the returns prepared by Taylor -- in some cases, the lists of contributions submitted with one person's return were identical to lists submitted with another's return --

they questioned Taylor.   Taylor told the IRS that it was his clients who had provided the fraudulent lists of deductions, and that he had simply served as a scrivener.  When confronted with the fact that many of the lists were identical, Taylor explained that he had mixed up documents at the copier, even though the lists had been submitted months apart.  According to testimony, Taylor then asked his clients to provide false information to the IRS by, inter alia, filling out blank receipts obtained from Goodwill and forging the signature of Goodwill employees.   The IRS did not believe Taylor's explanations for the discrepancies, and he was later arrested and charged with sixteen counts of tax fraud.

At trial, Taylor's clients testified that he had prepared the lists of deductions and that he had later asked them to lie to IRS agents if they asked about the returns.  Taylor's clients also stated that before Taylor had filled out their tax returns and afterwards, they had never falsely claimed a charitable contribution.  The clients testified that after the tax fraud was discovered, they were left with tax liabilities of, on average, $2,000 for each year that Taylor prepared their returns.

Taylor testified on his own behalf, denying involvement in any fraudulent scheme.  The jury returned a verdict finding Taylor guilty on sixteen counts of aiding in the preparation of false tax returns.  The jury further found that the aggregate value

-3-

of the fraud -- the amount of taxes not paid to the Government -- was $129,879.

The Probation Office prepared a pre-sentence report ("PSR") for Taylor. The PSR calculated a total offense level of 19 by adding a base offense level of 15, U.S.S.G. § 2T4.1(J), a 2-level enhancement for being in the business of preparing tax returns, U.S.S.G. § 2T1.4(b)(1)(B), and a 2-level enhancement for obstruction of justice on the ground that Taylor counseled two witnesses to falsify evidence and lie to the IRS, U.S.S.G. § 3C1.1. Taking into account that Taylor had no criminal history, the sentencing range under the advisory Sentencing Guidelines was 30 to 37 months in prison, one year of supervised release, and a fine of up to $60,000.

Taylor submitted a sentencing memorandum to the court suggesting that it depart from the sentencing guidelines and give him no jail time at all. Taylor offered a letter from Boston Public Schools stating that, based on the nature of his crime, Taylor would continue to be eligible for employment in the schools if he was not incarcerated. In addition, Taylor provided forty-eight letters from the president of the Boston Teachers Union, various current and former administrators and teachers in his school and the school system, parents and students, friends, colleagues, family members, members of his church, and members of the community. These letters all unequivocally stated that this

-4-

crime was an aberration for Taylor, and that he was generally a law-abiding person. Some of the letters noted that Taylor had played a very important role as a teacher at Fifield, that he was loved by students, and that Taylor often went above and beyond his job duties in organizing concerts and field trips for students, and in leading the school chorus and the band. Other letters stated that Taylor was the guardian for his mentally disabled brother, and that he had provided aid and comfort to many members of the community in their times of need.

At the sentencing hearing, a colleague of Taylor and Taylor's principal both testified on his behalf. The witnesses mostly repeated what was said in the letters, but added that although they would likely be able to find a new music teacher, Taylor was irreplaceable, and that they felt it unlikely that they would find someone who would put in as much time as Taylor did. In addition, the witnesses noted that Taylor was African-American and that he was a good role model to students in his school, who often did not encounter educated and professional African Americans. The Government argued that while Taylor had made significant contributions to his community and while this might warrant a somewhat lower sentence, Taylor's case still merited some amount of jail time so as to deter future offenders and to reflect the seriousness of the offense. In particular, the Government noted that Taylor had not accepted responsibility for his actions and

-5-

that he had lied about his role in the fraud throughout the case. Finally, Taylor made a brief statement to the court, stating that he was "embarrassed," and that he was "sorry that [he had] actually put [his] job into jeopardy as a music teacher." Taylor noted that he loved his job and wanted to continue working as a teacher in the schools.

The court decided to impose a sentence of five years probation, including five hours a week of community service and one year in a "halfway house," and a fine of $10,000. The court offered as justification for the sentence its belief that

> [Taylor's] level of service to the community is extraordinary community involvement which involves a traditional departure ground. I also think that if for some reason the appellate court did not think that it was a traditional departure ground because they felt it doesn't rise to the level of extraordinary, I would do it on the basis of a variance on the history and characteristics of the offender and the need to impose a punishment that is adequate but not [greater than necessary.] . . . I'm particularly not giving straight probation because I think that it's a serious crime, but I think that this is a way in which he can continue to give back to the community, and yet it will send that signal that the Government was correctly worried about to the world that you can't commit tax fraud and commit perjury and basically get straight probation.

The Government then objected to the sentence on the ground that it was not reasonable. The court overruled the Government's objection, and this appeal ensued.

## II. Discussion

### A. Standard of Review

First, we must discern the proper standard of review to apply to Taylor's sentence. The Government urges us to bifurcate our review, looking first to determine whether the district court abused its discretion in "departing" from the Sentencing Guidelines recommendation, and then reviewing the ultimate sentence for "reasonableness." Taylor, on the other hand, argues that we should eschew independent review of departures, and engage only in reasonableness review of the end product. Ultimately, because reasonableness review is not easily distinguishable from review for abuse of discretion, see Rita v. United States, 127 S. Ct. 2456, 2470-71 (2007) (Stevens, J., concurring) ("Simply stated, Booker replaced the de novo standard of review required by 18 U.S.C. § 3742(e) with an abuse-of-discretion standard that we called 'reasonableness' review." (quoting United States v. Booker, 543 U.S. 220, 262 (2005))), Taylor and the Government differ only as to whether or not an independent review of "departures" is merited.

The Government finds support for independent review of departures in the history of the sentencing statutes. Prior to the enactment of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act"), Pub. L. 108-21, 117 Stat. 650 (2003), we reviewed decisions to depart upwards or downwards from the sentencing guidelines for abuse of

discretion. See, e.g., United States v. Rodríguez, 327 F.3d 52, 55 (1st Cir. 2003). After passage of the PROTECT Act, courts of appeal reviewed out-of-Guidelines sentences de novo. 117 Stat. at 670, codified at 18 U.S.C. § 3742(e). However, in Booker, the Supreme Court severed and excised § 3742(e), finding that the effect of the de novo review standard was to "make Guidelines sentencing even more mandatory than it had been" and concluding that it "ceased to be relevant." 543 U.S. at 261. Although Booker extensively discussed the standard of review to be applied to sentencing appeals, the Court did not explicitly decide whether courts of appeal should return to the pre-PROTECT Act standard of review. Rather, it simply stated that

> the [pre-PROTECT Act] text told appellate courts to determine whether the sentence "is unreasonable" with regard to § 3553(a). Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable.

Id. at 261.

In the absence of explicit instructions from the Supreme Court, the Government argues, and some of our sister circuits have concluded, that the proper course of action is to revert to the pre-PROTECT Act standard, which separately reviewed Sentencing Guidelines departures for abuse of discretion. See, e.g., United States v. Wolfe, 435 F.3d 1289, 1295 n.5 (10th Cir. 2006)

-8-

(explaining history of sentencing statutes and concluding that departures should be reviewed for abuse of discretion); see also United States v. Shan Wei Yu, 484 F.3d 979, 987 (8th Cir. 2007); United States v. Husein, 478 F.3d 318, 325-326 (6th Cir. 2007); United States v. Crisp, 454 F.3d 1285, 1288 (11th Cir. 2006); United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006); United States v. Fuller, 426 F.3d 556, 562 (2d Cir. 2005). Two circuits, however, have eliminated separate review of departures under the Guidelines, concluding that post-Booker, independent review of Sentencing Guidelines "departures" largely replicates reasonableness review. See United States v. Mohamed, 459 F.3d 979, 987 (9th Cir. 2006) ("If we were to declare the sentence unreasonable, then the sentence would be invalid both because of the erroneous departure and because it is unreasonable. In any case, our review of the so-called departure would have little or no independent value." (emphasis in original)); United States v. Johnson, 427 F.3d 423, 426 (7th Cir. 2005) ("It is now clear that after Booker what is at stake is the reasonableness of the sentence, not the correctness of the 'departures' as measured against pre-Booker decisions that cabined the discretion of sentencing courts to depart from guidelines that were then mandatory.").

We agree that the concept of "departures" is somewhat "outmoded" in the post-Booker world. See United States v. Rinaldi,

461 F.3d 922, 929 (7th Cir. 2006). However, district courts are still required by § 3553(a)(5) to consider policy statements issued by the Sentencing Commission, and many of the traditional grounds for "departure" under the Sentencing Guidelines are, in fact, policy statements. District courts must properly interpret those policy statements (if they are relevant) and apply them to the facts of each case. See, e.g., United States v. Thurston ("Thurston I"), 358 F.3d 51, 78-79 (1st Cir. 2004) (holding that U.S.S.G. § 5H1.11 states that courts should impose lower sentences only for "extraordinary" good works), vacated and remanded in light of Booker, 543 U.S. 1097 (2005). Thus, at times, we may need to refer to our extensive body of departure-related law to independently determine whether a district court has complied with its obligation under § 3553(a)(5) to consider Sentencing Commission policy statements. As such, we cannot agree with the Seventh and Ninth circuits that appellate courts should never, as part of their reasonableness analyses, engage in an independent review of whether a district court properly interpreted the Sentencing Commission's policy statements in determining a sentence.

Thus, we think that where a party challenges a sentence as unreasonable because a district court has misconstrued a Sentencing Commission policy statement, appellate review should consist of determining whether a district court has correctly interpreted the policy statement and whether it has reasonably

-10-

applied the policy statement to the facts of the case. Once we have determined that a district court has complied with its statutory obligation to correctly consider the Sentencing Commission policy statements, appellate review of the ultimate sentence, including the weighing of those policy statements against the other § 3553(a) factors, should be for "reasonableness." Booker, 543 U.S. at 261.[1]

## B. Did the District Court Properly Interpret U.S.S.G. § 5H1.11?

The Government argues that the district court misinterpreted U.S.S.G. § 5H1.11, and thus erroneously considered it to militate in favor of a lower sentence in this case. U.S.S.G. § 5H1.11 is a policy statement of the Sentencing Commission and states, "[C]ivic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted." We have interpreted § 5H1.11 to apply only to extraordinary civic and charitable contributions. See Thurston I, 358 F.3d at 78-79; see

_____

[1] The Government also argues that appellate courts may not review a district court's decision to choose a lower (or higher) sentence based on a Sentencing Guidelines policy statement. We find this argument unusual, given that it would moot the Government's appeal inasmuch as the district court imposed a lower sentence on Taylor based on such a policy statement. While it is true that under existing circuit precedent, we may not review a district court's discretionary decision to find that a Sentencing Guidelines policy statement does not merit a sentence reduction in a particular defendant's case, United States v. Meléndez-Torres, 420 F.3d 45, 50-51 (1st Cir. 2005), this is beside the point. A sentence which takes into account a Sentencing Guidelines policy statement is, like all other sentences, subject to review for reasonableness.

also U.S.S.G. § 5K2.0(a)(4) ("An offender characteristic . . . not
ordinarily relevant in determining whether a departure is warranted
may be relevant to this determination only if such offender
characteristic or other circumstance is present to an exceptional
degree."). The district court appears to have properly interpreted
the policy statement, given its statement that it considered
§ 5H1.11 to apply because of Taylor's "extraordinary" good works.

In deciding whether U.S.S.G. § 5H1.11 applied to the
facts of Taylor's case, the district court noted that people from
all walks of life wrote to the court to attest to the fact that
Taylor had gone out of his way to help them and the community.
Many of Taylor's students and colleagues also wrote and testified,
explaining his importance to the school as a music teacher and that
he had often gone above and beyond his job duties to organize
concerts for pupils.   Perhaps the most striking testimony to
Taylor's contributions to his school was contained in a letter from
the Boston Public Schools indicating that Taylor would be allowed
to continue teaching if he was not sent to prison, notwithstanding
the fact that he had been found guilty of fraud.   In light of the
testimony at Taylor's sentencing hearing and the vast number of
letters documenting Taylor's extensive service to his community, we
believe that the district court reasonably interpreted the facts to
find that Taylor had engaged in extraordinary good works, and that
as such, U.S.S.G. § 5H1.11 militated in favor of a lower sentence.

Cf. United States v. Canova, 412 F.3d 331, 343 (2d Cir. 2005) (finding that a defendant had engaged in extraordinary good works "which included six years' service in the United States Marine Corps, 'exemplary and many times courageous service' as a volunteer firefighter, and Good Samaritan aid to 'three total strangers who were in extreme medical distress.'"). Although another judge might have decided otherwise, we conclude that the district court's determination was a reasonable interpretation of the facts before it.

## C. **Was Taylor's Sentence Unreasonable?**

Because the district court properly calculated the advisory Sentencing Guidelines range and correctly interpreted the relevant Sentencing Commission policy statements, and because there is no dispute that the court gave proper weight to the Guidelines, the only remaining question at issue in this appeal is whether the court's sentence was "reasonable." Jiménez-Beltre, 440 F.3d at 518 ("Booker's remedial solution makes it possible for courts to impose non-guideline sentences that override the guidelines, subject only to the ultimate requirement of reasonableness."); see also United States v. Trupin, 475 F.3d 71, 74 (2d Cir. 2007) (reviewing a sentence for reasonableness after determining that "[n]either the way in which the district court performed its duty to consider the section 3553(a) factors nor its Guidelines calculation is at issue").

-13-

In past cases, we have attempted, mostly in general terms, to describe how a district judge might arrive at a reasonable sentence for a defendant. We have expressed the need for district courts to provide a "plausible explanation and a defensible overall result." Jiménez-Beltre, 440 F.3d at 519. And although the Guidelines are not presumptively reasonable in this Circuit, see id. at 518, we have also agreed with Judge Posner's statement that "[t]he farther the judge's sentence departs from the guidelines sentence . . . the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed." United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006) (quoting United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005) (Posner, J.)).[2]

Notwithstanding these general pronouncements, we have tended to eschew more specific guidance, recognizing that judges must consider each defendant and his or her crime individually. See Jiménez-Beltre, 440 F.3d at 528 n.10 ("[W]e required, even

---

[2] In Rita, 127 S. Ct. at 2463, the Supreme Court held that it was permissible for an appellate court to presume that if "both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case[,] . . . . [t]hat double determination significantly increases the likelihood that the sentence is a reasonable one." However, the Supreme Court's opinion does not require such a presumption to be adopted, id. at 2468 (noting that "[s]everal courts of appeals have . . . rejected a presumption of unreasonableness"), and we have declined to adopt one, Jiménez-Beltre, 440 F.3d at 518.

-14-

before Booker, that a court's explanation of its sentence 'sufficiently show a thoughtful exercise of the court's sentencing responsibility and a degree of care and individualized attention appropriate to the solemnity of the sentencing task.'" (quoting United States v. Vázquez-Molina, 389 F.3d 54, 59 (1st Cir. 2004))); see also United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006) (Howard, J., concurring) ("District courts will inevitably approach sentencing differently post-Booker. Indeed, the legitimacy of a range of approaches is implicit in Booker's grant of added discretion to sentencing judges."). But see United States v. Thurston (Thurston II), 456 F.3d 211, 220 (1st Cir. 2006) ("Having reviewed the record, the recommended guideline sentence, and the § 3553(a) factors, we conclude that a sentence of fewer than 36 months' imprisonment would fail reasonableness review in the present circumstances."). We leave broad discretion to a district judge to determine an appropriate sentence because he or she will ordinarily have observed a trial from its inception, becoming intimately aware of the facts and the players involved.³

---

³ The discretion left to district judges in the wake of Booker, 543 U.S. 220, is not a particularly new development. Prior to the creation of the Sentencing Guidelines regime in the late 1980s, judges were given almost unfettered (and unreviewable) discretion to impose sentences as they saw fit. See generally Mistretta v. United States, 488 U.S. 361, 363-65 (1989) (reviewing history of sentencing in United States); Douglas Berman, Conceptualizing Booker, 38 Ariz. St. L.J. 387, 388 (2006) ("From the late nineteenth-century and throughout the first three-quarters of the twentieth-century, trial judges in both federal and state systems were given nearly unfettered discretion to impose any sentence from

See Rita, 127 S. Ct. at 2469 ("The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court."). In addition, a district judge will ordinarily be involved in sentencing on a far more regular basis than appellate judges, and thus will have a better eye for the ins and outs of criminal conduct and those who engage in it. Thus, a district court will be best placed to make the sorts of individualized determinations that allow the imposition of a sentence that is sufficient, but no greater than necessary, to achieve the stated purposes of 18 U.S.C. § 3553(a). Unwarranted interference in this process is likely to hinder individualized consideration and result in one-size-fits-all sentencing, an approach that was rejected long ago. See Williams v. New York, 337 U.S. 241, 247 (1949) ("The belief no longer prevails that every offense in a like legal

---

within broad statutory ranges provided for criminal offenses."). This discretion, however, led to "[s]erious disparities in sentences." Mistretta, 488 U.S. at 365; see also Berman, supra at 393 ("[S]ome studies found that personal factors such as an offender's race, gender and socioeconomic status were impacting sentencing outcomes and accounted for certain disparities."). As a result, in determining a sentence, judges must now consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). A judge must also continue to consider the sentencing guidelines, id. § 3553(a)(4)-(5), which reflect "the increased uniformity of sentencing that Congress intended its Guidelines system to achieve," Booker, 543 U.S. at 246.

-16-

category calls for an identical punishment without regard to the past life and habits of a particular offender.").

Turning to the case at hand, the district court decided that a sentence of probation and time in a halfway house was appropriate for Taylor, citing both U.S.S.G. § 5H1.11 and its belief that a "non-guidelines sentence" would best serve the sentencing goals listed in 18 U.S.C. § 3553(a).[4] Under 18 U.S.C. § 3553(a)(5), it was proper for the district court to consider Taylor's extraordinary good works pursuant to U.S.S.G. § 5H1.11, and in Thurston II, we stated that a district court might also consider ordinary charitable activities and good works as part of the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1). 456 F.3d at 219.

While these ordinary and extraordinary contributions to the community may have justified a sentence with less imprisonment

---

[4] We wonder, however, whether terming a sentence "guideline" or "non-guideline" appropriately reflects the proper role of the sentencing guidelines post-Booker. While the sentencing guidelines are to be accorded substantial weight, see United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006), and can be used as a starting point in the sentencing process, see United States v. Parrilla Román, 485 F.3d 185, 190 (1st Cir. 2007), the Guidelines are but one factor in the sentencing analysis, 18 U.S.C. § 3553(a) (4), a sentence outside of the guidelines need not be justified by unusual or extraordinary reasons, see Vázquez-Rivera, 470 F.3d at 449, and a within-guidelines sentence will not be considered presumptively reasonable by this court, see Jiménez-Beltre, 440 F.3d at 518. Thus, we do not find the term "non-guidelines sentence" to be useful except to the extent that it expresses the sentencing court's consideration that the advisory Guidelines recommendation was outweighed by other § 3553(a) factors.

than an otherwise similarly situated defendant, we cannot sustain the ultimate sentence imposed on Taylor based on the factors identified by the district court. In explaining its ultimate sentence, the district court noted that Taylor had committed a serious offense, and that he had lied in court. The court also noted that under the sentencing guidelines, which were considered as part of the sentencing process, the recommended sentence for Taylor was 30 to 37 months in prison. The court explained, however, that it did not feel that a sentence of jail time was appropriate because of the "fantastic contribution he has made to the community." Although we do not wish to unduly constrain the district court's sentencing discretion on remand, we do not think that these factors make Taylor's sentence of probation a plausible result. See United States v. Scherrer, 444 F.3d 91, 93 (1st Cir. 2006) ("[O]ur main concern is whether the court has adequately explained its reasons for varying or declining to vary from the guidelines and whether the result is within reasonable limits."). We briefly explain.

The offense that Taylor committed no less than sixteen times over a four-year period -- fraudulent preparation of tax returns -- is a serious crime. While tax fraud is not violent in nature, at its heart, it is theft, specifically theft of money to which the public is entitled. See Trupin, 475 F.3d at 76 (noting that the defendant "in effect stole from his fellow taxpayers

-18-

through his deceptions" and that "[a] seven-month term of imprisonment fails to reflect as much"). Furthermore, the tax fraud committed here was not part of an indigent's effort to avoid personal tax liability, but rather, the supplemental business of a moderately successful man who misled his clients. Cf. United States v. Thurman, 179 Fed. Appx. 971, 972 (7th Cir. 2006) (noting with approval that "[t]he district court concluded that because Thurman was not selling drugs to support his own addiction, but instead as an illegal business, his crime was more offensive in nature"). In addition, as the district court recognized, Taylor repeatedly obstructed justice during the course of the investigation and the trial by asking his clients to misinform the IRS and provide inaccurate testimony. See Rinaldi, 461 F.3d at 931 (finding reasonable a district court's consideration of the defendant's obstruction of justice as a factor meriting a higher sentence); United States v. Bradstreet, 135 F.3d 46, 57 (1st Cir. 1998) ("One convicted of criminal dishonesty is therefore not entitled to an aberrant conduct departure if he has testified dishonestly about his criminal conduct."). Moreover, the trial transcript provides no indication whatsoever that Taylor has accepted responsibility for his actions. To put it succinctly, we do not view the sentence as having given full consideration to the nature and circumstances of Taylor's crime, 18 U.S.C. § 3553(a)(1), and the need to reflect its seriousness, 18 U.S.C. § 3553(a)(2)(A).

-19-

In addition, we believe that the district court accorded incommensurate weight to the fact that Taylor's absence from school would negatively affect his students. We need not decide whether, in considering the history and characteristics of the defendant, a court may consider the effect of the defendant's incarceration on others. Cf. United States v. Holz, 118 Fed. Appx. 928, 935-36 (6th Cir. 2004) (deciding that a court may consider the impact on a defendant's business and employees when imposing a sentence). However, if a district court did take such an impact into consideration, we think it would also have been necessary to consider the fact that "[i]t is not extraordinary that in the area of white collar crime, a principal's business and employees may suffer if he is incarcerated." United States v. Pool, 474 F.3d 1127, 1129 (8th Cir. 2007).

Furthermore, the court was also obligated to consider whether Taylor's sentence would serve the purpose of providing "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). In particular, we have recognized that "deterrence of white-collar crime [is] of central concern to Congress." United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006). When passing the Sentencing Reform Act, Congress explained:

> [It is our] view that in the past there have been many cases, particularly in instances of major white collar crime, in which probation has been granted because the offender required little or nothing in the way of institutionalized rehabilitative measures

> . . . and because society required no
> insulation from the offender, without due
> consideration being given to the fact that the
> heightened deterrent effect of incarceration
> and the readily perceivable receipt of just
> punishment accorded by incarceration were of
> critical importance. The placing on probation
> of [a white collar criminal] may be perfectly
> appropriate in cases in which, under all the
> circumstances, only the rehabilitative needs
> of the offender are pertinent; such a sentence
> may be grossly inappropriate, however, in
> cases in which the circumstances mandate the
> sentence's carrying substantial deterrent or
> punitive impact.

S. Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N.

3182, 3274-75; see also United States v. Martin, 455 F.3d 1227,

1240-41 (11th Cir. 2006) (considering the Senate Report and adding

that "Rather than deter crime by others, [the defendant's] 7-day

sentence suggests that those similarly situated . . . could profit

from fraudulent conduct"); Thurston II, 456 F.3d at 218 (noting

that Congress has concluded that prison sentences tend to deter

white-collar criminals).[5]    We do not see why Taylor is an

aberration from the overall conclusion that the threat of jail time

deters white-collar crime, and thus we are not convinced that a

non-jail sentence for Taylor would adequately serve the goal of

general deterrence.

---

[5]    As we noted in Thurston II, although a district court might
disagree with the link between prison sentences and deterrence of
white-collar crime, its focus should be on the individual
characteristics of the defendant, rather than general policy
considerations.    456 F.3d at 218.

Finally, we are unpersuaded that this sentence reasonably reflects "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."[6]   18 U.S.C. § 3553(a)(6).   The Sentencing Guidelines highlight the problem:

> Under pre-guidelines practice, roughly half of all tax evaders were sentenced to probation without imprisonment, while the other half received sentences that required them to serve an average prison term of twelve months. This guideline is intended to reduce disparity in sentencing for tax offenses and to somewhat increase average sentence length.

U.S.S.G. § 2T1.1 background note.   In addition, courts have recognized that "the minimization of discrepancies between white-

---

[6]    Taylor cites various cases in which other defendants have received somewhat lower sentences for their past good works. See, e.g., United States v. Canova, 412 F.3d 331 (2d Cir. 2005); United States v. Woods, 159 F.3d 1132 (8th Cir. 1998). While these cases are persuasive inasmuch as they have held that a defendant's good works are a permissible consideration in the sentencing process, we do not believe them to be apt comparisons for the purpose of establishing that Taylor's sentence is or is not within the norm. As we have explained, the focus of § 3553(a)(6) is on nationwide sentencing disparities, rather than disparities between the sentences given to individual defendants.   See Thurston II, 456 F.3d at 216.

To the extent that Taylor offers these cases to show that his sentence is reasonable, we respond that they are no more probative of reasonableness than cases in which courts have rejected appeals by defendants challenging their sentences as too high in light of their good works, see, e.g., United States v. Baxter, 217 Fed. Appx. 557 (7th Cir. 2007), or cases in which courts have found sentences unreasonable on the ground that they excessively relied on a defendant's good works, see, e.g., United States v. Mallon, 345 F.3d 943, 949 (7th Cir. 2003).   In the post-Booker world, sentencing must be truly individualized.

-22-

and blue-collar offenses" is an important goal in the sentencing process. Mueffelman, 470 F.3d at 40; see also Thurston I, 358 F.3d at 80. We recognize that because of Taylor's extraordinary service to the community, he may not be easily comparable to "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). However, it is important to recognize that persons convicted of white collar crimes "are often expected, by virtue of their positions, to engage in civic and charitable activities." Thurston I, 358 F.3d at 80.

Thus, we conclude that the district court should resentence Taylor by taking proper account of all of the factors listed in 18 U.S.C. § 3553(a) and providing a reasoned explanation for its result.

## III. Conclusion

For the foregoing reasons, we vacate the sentence of the district court and remand for resentencing.

## Vacated and Remanded.

-23-